746 So.2d 88 (1999)
Mildred BOLDEN, Individually and on Behalf of Her Deceased Son, Michael Bolden, Plaintiff, and
Charlie Gardner, Intervenor,
v.
Michael RODGERS, Pershing Mero and Kansas City Southern Railroad.
No. 99-CA-417.
Court of Appeal of Louisiana, Fifth Circuit.
September 28, 1999.
*89 Geri Broussard-Baloney, Garyville, LA, Attorney for Intervenor-Appellant, Charlie Gardner.
John J. Hainkel, III, Greg A. Pellegrini, New Orleans, La, Attorneys for Defendants-Appellees, Kansas City Southern Railway Company, Michael Rogers and Pershing Mero.
Richard L. Root, Betsy J. Barnes, New Orleans, LA, Attorneys for Plaintiff-Appellee, Mildred Bolden.
Panel composed of Judges H. CHARLES GAUDIN, CHARLES GRISBAUM JR. and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
Charlie Gardner III (also known as Charlie Gardner Jr.) appeals the dismissal of his intervention in this survival and wrongful death action arising from the death of Michael Bolden. We reverse and remand.
Michael Bolden died in a railroad crossing accident on September 9, 1996. His mother, Mildred Bolden, filed a survival and wrongful death action against the railroad company and others. Charlie Gardner III filed a petition of intervention, asserting that he is the father of the deceased and adopting the allegations set forth in Mildred Bolden's petition.[1]
The defendants filed exceptions of lack of procedural capacity and no right of action, asserting that Gardner lacks capacity to proceed because he is not the legal father of the deceased and that he has no right of action because he is not among the parties listed in La. C.C. arts. 2315.1 and 2315.2. Alternatively, they asserted that even if Gardner is Michael Bolden's father, he has no right to seek survival and wrongful death damages because he abandoned the decedent during his minority.
The trial court granted the exceptions, stating:
The person called Charlie Gardner III has not proven by clear and convincing evidence that he is the father of Michael Bolden. He lacks procedural capacity to proceed and can assert no cause of action for survival and wrongful death damage. Michael Bolden took no action toward filiation during his lifetime. The birth certificate of Michael Bolden, produced during discovery, reflects that one Perry Bolden is the father of the decedent. Gardner was not married to Mildred Bolden at the time of conception nor at the date of birth. The testimony suggests that Gardner had not asserted his relationship until relatively recently. Further, Mildred Bolden's testimony clearly contradicted Gardner's assertions of paternity.
On appeal Mr. Gardner asserts the trial court erred in the following respects: (1) *90 failing to find that he proved by clear and convincing evidence that he was Michael Bolden's father, (2) considering Perry Bolden's being named as the father on Michael Bolden's birth certificate as evidence that appellant is not the natural father; (3) finding that appellant had not asserted his relationship to the decedent until relatively recently; and (4) applying the clear and convincing standard in finding that appellant failed to carry his burden of proving paternity.

FACTS
The following evidence was presented:
Michael's birth certificate shows his date of birth was April 5, 1969, lists his mother as Mildred Joseph, and lists his father as Perry Bolden. Perry Bolden's age at the time of the birth is listed as 28. There was testimony, however, that Perry Bolden had died several years before Michael was born.
Mildred Bolden's testimony was presented through excerpts from her deposition. She did not deny that Charlie Gardner was Michael's father, but denied that Charlie acknowledged his paternity of the boy. She said that when Michael was born, "Charlie said he wasn't his child." According to her, one day when Michael was five she met Charlie while he was cashing a check at a store. In front of the people in the store Charlie told her, "You better get that boy out of my face because he [sic] not my son." She insisted that Charlie had not acknowledged Michael as his son until Michael was 25 or 26. She denied that Charlie ever gave her money for Michael.
Charlie Gardner testified that he knew that Michael Bolden was his son. He stated that he lived with Mildred Bolden for "six or seven months ... about a year or something" before Michael was born. He denied that Mildred had a husband at the time, stating that Perry Bolden had died "around '64 or '65" and thus could not have been Michael's father. He stated he lived with Mildred "off and on" after Michael was born. He said he saw Michael about two days after his birth and that he continued to visit Michael "all the time." Asked whether he provided any support to Mildred for Michael, he said, "I gave to her and then I supported him for clothes and stuff." He claimed he had bought diapers, milk, shoes and clothes for Michael.
Gardner testified that he had taken Michael to visit his own parents, that Michael knew them as his grandparents and used to visit them a lot, and that Michael addressed Gardner's own brothers and sisters as "aunt" and "uncle." Gardner said he used to bring Michael to visit at his own home and that Michael had met his other children. He denied that Mildred had ever sought child support from him, but claimed he used to give her money: "Any time I see her, you know, I give her all the time." He said that he bought Christmas presents for Michael and that Michael used to visit on holidays. Asked whether he told other people Michael was his son, Gardner said, "I had a lot of friends I had told that was my son.... The only dad they know was me."
Gardner knew his name is not on Michael's birth certificate and he admitted he never signed any papers stating that he was Michael Bolden's father. He said he has no receipts for money he gave Mildred for Michael because he gave her cash. He denied ever telling Mildred, "Get that boy out of my face because he's not my son," although he stated he believes Mildred is a truthful and honest person. He stated he was the only fellow Mildred was seeing during the time that Michael was conceived.
Joseph Smith testified that Mildred Bolden is his first cousin, that he knows Charlie Gardner, and that he knew Michael Bolden very well. He lived with Mildred and Michael off and on during the 1960s, '70's, '80's, and off and on during 1992. He claimed a close relationship with Mildred and said she admitted to him that Charlie Gardner is Michael's father. He *91 stated that Michael recognized Charlie as a daddy and that Charlie admitted that Michael was his son. He said Charlie and Michael had frequent contact, that Charlie used to support him, and that they had a very good relationship.
According to Smith, Mildred used to tell Michael to "go see his daddy and get some money to buy school clothes." Smith also said he had seen Charlie give Mildred and Michael money: "Every payday he used to come by and give her money.... When her income used to fall low, she used to contact Charlie when he'd come by and she'd get money from him." He also said Charlie bought Michael Christmas presents and Michael used to spend holidays with Charlie.
Smith also stated that Michael had told other people that Gardner was his father. He characterized the relationship between Michael and Charlie as "very close ... he used to look for Charlie every Friday to get money from him, including Mildred Mae when her income fall low."
Smith said that Michael used to visit with Charlie's parents, Michael called Charlie's brothers and sisters "uncle" and "aunt," and Michael considered Charlie's other children his brothers and sisters. Smith said that Charlie lived with Mildred occasionally during the '60's and '70's when Smith was living at her house.
Louis Gardner, Charlie Gardner's brother, testified he knew Michael Bolden because his brother is Michael's father. Michael used to call him "uncle." Louis said Michael would visit his Gardner grandparents on occasional holidays and would stop by if he was passing through the area. According to Louis, Charlie "took care of" Michael and "supported him as a father... give him money when he needed it." He said Michael would call and say, "Tell my daddy to come visit me." He had seen Charlie give Michael money. He said that Charlie recognized Michael as his son and that no one else in the community ever claimed to be Michael's father. He had never heard Charlie deny that he was Michael's father. However, Louis also said he considered Mildred to be a truthful and honest person.
Markeisha Johnson testified that Charlie Gardner is her father and that she knew Michael Bolden as her brother. She had known him all her life. Michael had visited with her family for Christmas. Her daddy had brought Michael in front of the family and told him, "That's your brothers and sisters." She also had encountered Michael in public and had heard him tell his friends, "This is my sister right here." She had seen her father give money to Michael. She had never seen her father give money to Mildren Bolden, however.
A copy of an obituary program for Michael's funeral service on September 14, 1996, was submitted as evidence. The program states that Michael "was born on April 5, 1969 to Mrs. Mildred Mae Bolden of Reserve, La. and Mr. Charlie Gardner III, of Garyville, La." It lists Louis Gardner, Lester Gardner and David Gardner as pallbearers. Among the surviving family members are listed "His grandparents Mr. Charlie Gardner Jr. and Eula Mae Gardner of Garyville."

LAW
The arguments on appeal are directed less to whether Charlie Gardner was Michael Bolden's biological father than to whether Gardner had informally acknowledged Michael during his minority.
La. C.C. art. 2315.1 provides for the survival action and Art. 2315.2 provides for the wrongful death action. Each of them designates the persons entitled to pursue the actions as, first, the "surviving spouse and child or children of the deceased, or either the spouse or the child or children"; next, the "surviving father and mother of the deceased, or either of them if he left no spouse or child surviving." La. C.C. art. 2315.1(A); La. C.C. art. 2315.2(A). Thus, Mildred's and Charlie's claims arise under *92 the second group, since Michael had no spouse or child.[2]
Both articles currently also provide, "For purposes of this Article, a father or mother who has abandoned the deceased during his minority is deemed not to have survived him." La. C.C. art. 2315.1(E); La. C.C. art. 2315.2(E). Appellees rely on the Paragraph E exception in arguing that the intervenor cannot recover.
However, the Paragraph E exclusion was not part of either article at the time of Michael Bolden's death. It was added to Arts. 2315.1 and 2315.2 by Acts 1997, No. 1317, § 1. Section 3 of Act 1317 provides, "The provisions of this Act shall be applicable only to causes of action which arise on or after the effective date here." The effective date of Act 1317 of 1997 was July 15, 1997. Because Michael Bolden died in 1996, therefore, the provision excluding as "presumed deceased" parents who abandon a child during his minority does not apply to this case.
Hence, our focus is on determining whether the trial court erred in applying the "clear and convincing" standard of evidence to the question of Gardner's paternity of Michael and whether the court was clearly wrong in concluding that the intervenor had not met his burden of proof.
The Civil Code provides several ways to prove or disprove filiation of children. Husbands may, with proper proof, disavow children born to their wives (La.C.C.arts. 187-190); biological parents may legitimate or acknowledge their illegitimate children in various ways (La.C.C.arts.198-206); illegitimate children themselves may sue for filiation (La.C.C.arts.208-211). The Civil Code, however, provides no process for a biological father to establish his parentage of his illegitimate child.
Nevertheless, the jurisprudence has recognized an avowal action, by which biological fathers may establish their paternity of their illegitimate children. T.D. v. M.M.M., 98-167 (La.3/2/99) 730 So.2d 873. This action is available despite the presumption that the husband of the mother is the father of all children born or conceived during the marriage. Id. Hence, a child may have "dual paternity," in which the husband of the mother is the child's legal father because he did not disavow the child as provided in Art. 184, while the biological father may establish paternity and, with a proper showing, obtain certain parental rights. Smith v. Cole, 553 So.2d 847 (La.1989). There is no prescription statute applicable to a father's action to avow his biological child. T.D. v. M.M.M., supra.
The right of avowal is not absolute, however. It is the actual relationship with the child that is determinative, not the mere biological connection. Geen v. Geen, 95-984 (La.App. 3 Cir. 12/27/95) 666 So.2d 1192, 1194, writ denied, 96-201 (La.3/22/96) 669 So.2d 1224. A biological parent who knows of or has reason to know of the existence of his biological child and who fails to assert his rights for a significant amount of time, cannot come forward later and assert paternity. Smith v. Jones, 566 So.2d 408, 414 (La.App. 1 Cir.1990), writ denied sub nom., Kemph v. Nolan, 569 So.2d 981 (La.1990). It is the province of the trial court to determine the nature and extent of a biological father's rights to his illegitimate child. T.D. v. M.M.M., supra; Maxwell v. LeBlanc, 434 So.2d 375 (La.1983).
An illegitimate child must prove filiation to a living parent by a preponderance of the evidence, but to a deceased parent by clear and convincing evidence. La. C.C. art. 209(A)-(B).[3] In the situation at bar, *93 in which an illegitimate parent is trying to prove filiation to a deceased child, the trial court simply inverted the relationship between the parties and applied the standard of Art. 209(B), which required the intervenor to prove filiation to his deceased putative son by clear and convincing evidence.
The trial court's determination that the clear and convincing standard applies is supported by Chatelain v. State, Dept. of Transp. And Development, 586 So.2d 1373 (La.1991), in which the court held that the clear and convincing standard of Art. 209 applies when a party attempts to prove an illegitimate child was legitimated by the subsequent marriage of the parents under La. C.C. art. 198. The court reasoned:
The burden of proof by clear and convincing evidence requires a party to persuade the trier of fact that the fact or causation sought to be proved is highly probable, i.e. much more probable than its non-existence.... This burden is an intermediate one between the burden of proof by a preponderance of the evidence and the burden of proof beyond a reasonable doubt.... The requirement of proof by clear and convincing evidence has traditionally been applied in cases in which there is a special danger of deception or in which the particular type of claim is disfavored on policy grounds....
It is logical that a higher standard of proof should be required for both filiation and legitimation when the alleged parent is dead. Claims by an illegitimate child to the property of an alleged parent or to the status of a wrongful death beneficiary of the alleged parent, when not presented until after the death of the alleged parent, are replete with danger of fraud.... There is generally no less danger of deception when the illegitimate child is basing his claim on legitimation by subsequent marriage and informal acknowledgment, rather than on filiation.... Indeed, because there is no time limitation on asserting legitimation, the danger may be even greater.... [Citations and footnotes omitted.]
586 So.2d at 1378-1379.
Courts have been reluctant to recognize an informal acknowledgment for purposes of filiation unless the father has recognized the child as his own unequivocally and on several occasions. Chatelain v. State, DOTD, supra, at 1379.
[I]n the absence of other evidence, acts by the father recognizing the child as his own must be unequivocal and frequent to constitute an informal acknowledgment. This is particularly so when the illegitimate must prove filiation by clear and convincing evidence such that the actions by the alleged father must be of such frequency that the trier of fact is convinced that paternity is "highly probable, i.e. much more probable than its non-existence." Id.
Sudwischer v. Estate of Hoffpauir, 97-0785 (La.12/12/97) 705 So.2d 724, 731-732.
We find the cases which held that the burden of proof in avowal actions is merely preponderance of the evidence are distinguishable. Cook v. Sager Brown School, 486 So.2d 981, 982 (La.App. 1 Cir.1986); George v. Breaux, 486 So.2d 1159 (La.App. 3 Cir.1986). Neither of those cases discussed the Civil Code articles on filiation and legitimation. Further, both of them predated several significant state Supreme Court cases in this area of law (Smith v. Cole, supra; Chatelain v. State, Dept of Trans. And Development, supra; T.D. v. M.M.M., supra).
*94 We conclude the trial court was correct in finding that the "clear and convincing evidence" standard of proof applies in this case.
We turn next to whether the court was correct in finding that intervenor failed to carry that burden of proof. For an appellate court to reverse a trial court's factual finding, it must find from the record that there is no reasonable factual basis for the trial court's finding and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The issue is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Stobart v. State, DOTD, 617 So.2d 880, 882 (La.1993).
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's, where conflict exists in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Id.
Informal acknowledgment is not specifically defined or authorized by the Louisiana Civil Code, but is instead a product of our jurisprudence.... Proof of informal acknowledgment is made by proving paternal descent....
* * *
A review of the jurisprudence ... reveals that the courts have generally been reluctant to find an acknowledgment (or proof of paternity) unless the father continuously and unequivocally recognizes the child as his own. In several cases where the court found an informal acknowledgment or sufficient proof of paternity, the court stressed the importance of (1) continuous acknowledgment, or (2) "habitual acknowledgment", and (3) proof that the alleged father was generally reputed to be the father of the child.
* * *
Obviously, the determination of whether or not there has been an informal acknowledgment or sufficient proof of descent from the alleged parent is a factual determination which must be made by reference to the record as a whole.... Thus, if there is a reasonable factual basis for the trial judge's conclusion regarding informal acknowledgment or proof of descent, his conclusion should not be disturbed on appeal.
Succession of Matte, 346 So.2d 1345, 1349-1350 (La.App. 3 Cir.1977).
Our review of the record convinces us the trial court was clearly wrong in finding that the proof of the intervenor's paternity of the deceased was not "clear and convincing." First, the court erred in finding that Michael's birth certificate, which listed Perry Bolden as his father, was persuasive against Gardner's paternity. According to Gardner's testimony, which was not contradicted, Perry Bolden died in 1964 or 1965. Therefore, Mildred's marriage to Perry Bolden was dissolved by his death prior to January 1, 1966. Michael was not born until April 4, 1969. Under La. C.C. art. 185, a child born more than 300 days after dissolution of the marriage is not presumed to be the child of the husband. Michael's date of birth was more than 300 days after January 1, 1966. Therefore, he cannot be presumed to be the child of Perry Bolden.
Further, the court erred in relying on Michael's own lack of effort toward filiation during his lifetime. According to the testimony not only of the intervenor, but also of Joseph Smith, Louis Gardner and Markeisha Johnson, Michael visited not only Charlie Gardner but also other members of his family, and acknowledged his relationship to them.
The proof offered may have been insufficient to prove the intervenor acknowledged Michael Bolden during Michael's minority, since none of the witnesses listed dates in their testimony regarding contacts *95 between Michael and Charlie. Nevertheless, it is clear that Gardner did openly acknowledge Michael during Michael's lifetime. Further, as noted above, Mildred's testimony implicitly admits Charlie is Michael's biological father, although she denied that Charlie ever paid her support for Michael or bought things for him. We find on the record before us that the intervenor proved by clear and convincing evidence that he is the father of the deceased. Accordingly, the exceptions should have been denied.
For the foregoing reasons, the judgment granting the exceptions against the intervenor and dismissing the intervention is reversed. The exceptions are overruled, the intervention is reinstated, and the matter is remanded for further proceedings. Costs of this appeal are assessed against the appellees.
REVERSED AND REMANDED.
NOTES
[1] Gardner designated himself as "Charlie Gardner III" in his petition of intervention, but as "Charlie Gardner Jr." at the hearing.
[2] The defendants also asserted an exception of no right of action against Mildred also, alleging that Michael had a surviving illegitimate child, but the trial court denied the exception on the ground that defendants had failed to prove the existence of a child. That ruling is not before us on this appeal.
[3] Art. 209. Proof of filiation

A. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged living parent by a preponderance of the evidence....
B. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged deceased parent by clear and convincing evidence....